Hillsborough, } No. 3632.
Mar. 4, 1947. }

FLOYD DURIVAGE *v.* HENRY W. TUFTS.

YVONNE DURIVAGE *v.* SAME.

YVONNE DURIVAGE, *Adm'x of the estate of*

Robert N. Durivage *v.* SAME

266

*John D. Warren* and *Albert Terrien* (*Mr. Warren* orally), for the plaintiffs.

*Ivory C. Eaton* and *Robert J. Doyle* (*Mr. Doyle* orally), for the defendant.

BRANCH, C. J. The plaintiff Floyd Durivage, was employed by the defendant to work upon his poultry farm in Hudson. The agreement between them as stated by the plaintiff was: "I was to get $30 a week and the house with the rent and wood and lights." The plaintiff continued to work under this arrangement for six months until January 19, 1944, when he was discharged by the defendant, who ordered him "to move right off my farm." Three days later, on the 22nd of January, they had another conversation in the yard, at which time the plaintiff testified: "He told me I couldn't have any more wood, and he said if he had his gun with him he would shoot me." On January 25, the plaintiff ran out of wood, and on the 26th the de-

fendant again ordered him to get out and said: "If I took one stick of wood he would have me arrested." Later, on the same day, the plaintiff, Yvonne, who was pregnant, was taken to a hospital and gave birth to a child, the above-named Robert N. Durivage. The birth was claimed to have been premature. A sister of the plaintiff Yvonne stayed at the house with the six other children. On January 28, these children were removed to the County Farm in Grasmere by the New Hampshire Department of Public Welfare without the knowledge or consent of the plaintiff, Floyd Durivage.

In granting a nonsuit upon this state of facts, the Trial Court stated his reasons as follows: "The Court rules as a matter of law that the occupancy of the camp by Mr. Durivage was incidental to his employment. It was on a farm requiring his presence, apparently from the evidence, most of the time on the premises; that the relation of landlord and tenant did not exist, and Mr. Durivage was there solely as the employee of Mr. Tufts, and upon the termination of his services, voluntary or involuntary, Mr. Tufts was entitled to the possession of the premises." We are in full accord with this statement of the facts and the law applicable thereto. As in the case of *Bowman* v. *Bradley*, 151 Pa. St., 351, the subject matter of the contract between the parties was labor. Labor was what Tufts needed and undertook to pay for. It was what Durivage offered to furnish him at an agreed price. The house was a convenient place for the residence of a laborer. His possession was that of the owner whom he represented and for whom he labored for hire. No relation of landlord and tenant existed between the parties. When the employment ceased, the plaintiff became at most a tenant at sufferance who was not entitled to any notice to quit and who cannot maintain an action of trespass against the owner who enters and dispossesses him. *Weeks* v. *Sly*, 61 N. H. 89, 90. The claim of the plaintiff that he was illegally evicted cannot be sustained.

Neither can he maintain an action for assault. He bases the latter claim upon the threat of the defendant made upon January 22, that "If he had his gun with him he would shoot me." It is elementary law that apparent present ability to execute a threat of physical harm is necessary to constitute an assault. 6 C. J. S. *Tit.*: Assault and Battery, s. 6. This was clearly lacking in the present instance and a nonsuit granted in the first of the above actions was properly ordered.

The case of Yvonne Durivage, so far as it rests upon a claim of illegal eviction, stands no better than that of her husband, but the claim of assault upon her rests upon a different basis. She testified

that upon the 19th of January, 1944, she was eight months along in pregnancy; that upon January 26th the defendant came to the house while her husband was away at work and conducted himself as follows: "Well, he came in the house and he told me we had to get out of the house right away; that we could have no more wood and he would shut the lights off, and he would come back and take the windows out if he had to. When he went back to his house I tried the lights and I knew he did turn the lights off and I was afraid he would come back and take the windows out. Q. Did he do anything besides talk to you? A. He talked awfully loud and shook his fists at me. Q. How did that make you feel? A. I was all upset and nervous and began to ache all over, just like a shock went through me. Q. Were you afraid? A. I was very frightened. Q. After he left what did you do? A. I went back to bed. I began to shake all over and I didn't know what to do, and I began to have pains then."

Although it was in evidence that the defendant Tufts had only one arm, the foregoing evidence, if believed, would sustain a finding that by his threatening conduct, the plaintiff was actually put in fear and as a result, suffered a miscarriage. In other words, a verdict for the plaintiff upon the allegation of assault would be sustainable. In the case of Yvonne Durivage there must, therefore, be a new trial. As to the nature and extent of the damages which she can claim in such an action, see *Prescott* v. *Robinson*, 74 N. H. 460.

In the action of Yvonne Durivage, administratrix, the allegation is that the defendant "on January 26, 1944, made an assault with force and arms upon the mother of the deceased Robert N. Durivage while said mother was pregnant with child . . . and by reason thereof the said mother gave birth prematurely to the said child and the said child was therefore born weak, frail and feeble, and thereafter on April 26, 1944, the said child Robert N. Durivage died, and that the gross, aggravated and malicious wrongs as the defendant then and there did as above set forth was the proximate cause of his death, and that an action has accrued to his administratrix to have and to recover the sum of $10,000 as damages caused by the trespass, assaults and wrongs aforesaid."

The plaintiff concedes that, "in the absence of a statute, a majority of decisions support the rule denying the existence of a right to sue, by a child or its personal representative, for damages for prenatal injury," and this is undoubtedly true. 43 C. J. S. *Tit.:* Infants, *s.* 104, *p.* 270; 27 Am. Jur. *Tit:* Infants: *s.* 3; "Prenatal Injury As Ground of Action," note to *Drobner* v. *Peters*, 232 N. Y. 220, in 20 A. L. R. 1505; also note

to *Magnolia &c. Co.* v. *Jordan*, 124 Tex. 347, in 97 A. L. R. 1524. The plaintiff suggests, however, that we should re-examine the law and announce a contrary rule. Before entering upon such an undertaking we think that the factual basis of the plaintiff's claim should be examined for the purpose of determining whether she can succeed upon any theory of the law.

It should be noted in the first place that this is not a case where the infant, after birth, showed tangible evidence of physical injury as a result of violence done to the mother. As disclosed by the evidence, the claim is simply that the mother was frightened by the defendant and gave premature birth to the infant as a result. The only evidence tending to connect the death of the child with his premature birth was the testimony of the parents. The father testified as follows: "Q. Now when you saw your baby, how did that baby compare with the other children your wife had been delivered of? A. He looked much smaller and looked very sickly to me, and cried lots . . . Q. Did that child live? A. No, it didn't. Q. When did it die? A. It died April 26, three months to the day after it was born. Q. And did that child that died, from the time you first saw it, did you ever notice any improvement in the child? A. No, it didn't gain any, it didn't improve much. Q. Did you call in a doctor for the child? A. No, we didn't." The mother testified to the same effect. "Q. Will you describe to the jury how that baby looked to you compared with your other babies? A. This baby was lots smaller than the others and cried all the time and didn't eat good, and after I brought him home he didn't gain any weight. Q. Did you call any doctor for him when you got home? A. I didn't."

Neither of the parents mentioned upon direct examination the following facts which were elicited by the defendant on cross-examination. The testimony of Floyd Durivage: "Q. Just before the baby died was the baby sick with anything? A. Yes, it was. Q. All right. What was it sick with? A. Measles. That was on the paper that she got, the certificate. Q. And when the baby died Dr. Davis came to your house? A. Yes. Q. You talked with the doctor? A. Yes, I think I did. Q. You asked the doctor what caused the baby to die? A. Yes. Q. What did he tell you? A. He said it was pneumonia and measles. Q. You had no doctor take care of that child, did you, before it died? A. No." Testimony of Yvonne Durivage: "Q. Was that baby broken out? A. He wasn't broken out in the face. Q. I didn't ask you that. Was that child broken out with the measles when you washed it? A. Yes it was."

As stated in *L'Esperance* v. *Sherburne*, 85 N. H. 103, 110: the question of the cause of the child's death "was one upon which 'common knowledge furnishes no criterion for judgment and evidence becomes indispensable.' *Russell* v. *Railroad*, 83 N. H. 246, 249. And the evidence must show more than a mere chance. It must establish a balance of probability. Proof of some probability is not enough. The proposition must be shown to be more probably true than not. *Salinger* v. *Salinger*, 69 N. H. 589; *Russell* v. *Railroad, supra.*"

The issues here involve matters peculiarly within the knowledge of the medical profession (See *April* v. *Peront*, 88 N. H. 309, 311) and, in the absence of medical testimony, a conclusion thereon would be sheerest speculation. This was clearly indicated by the testimony of Floyd Durivage, as follows: "Q. You don't blame Tufts for the measles, do you? A. No. Q. You don't blame Tufts for the child having pneumonia, do you? A. It wouldn't have had pneumonia if it was born on time. Q. Do you suppose a child catching a cold and getting pneumonia, was that Tufts' fault? A. It could be." If "it could be" that Mr. Tufts' conduct was remotely responsible for the death of the infant, this possibility did not supply the requirement of evidence set forth in *L'Esperance* v. *Sherburne, supra.* The only medical testimony in the case, the statement of Dr. Davis as reported by the plaintiff Floyd Durivage, was directly contrary to the claim of the plaintiff administratrix. In this state of the proof it would have been error to submit this case to the jury under any possible view of the law, and the nonsuit was properly ordered.

*Judgments for the defendant in the first and third actions;*
*New trial in the second action.*

All concurred.